UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
DEAMON JENKINS,                        :

                          :

           Petitioner,           :

                          :

      - against -               :

                          :

MICHAEL CAPRA, *Superintendent of Sing*    :
Sing Correctional Facility,

                          :

           Respondent.       :
-------------------------------------------------------------X

23-CV-8274 (PAE) (RWL)

**REPORT AND RECOMMENDATION
TO HON. PAUL A. ENGELMAYER:
PETITION FOR HABEAS CORPUS**

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 11/21/2024

**ROBERT W. LEHRBURGER, United States Magistrate Judge.**

      Petitioner Daemon Jenkins ("Jenkins" or "Petitioner"), proceeding *pro se*, brings this petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 challenging his conviction and sentence in state court for conspiracy in the fourth degree to sell ten or more firearms in New York State and four counts of third-degree sale of a firearm. Jenkins argues that his petition should be granted because (1) the prosecution failed to prove jurisdiction in New York over Jenkins for his role in the alleged crimes; (2) the Government did not prove conspiracy in the fourth degree but sentenced Jenkins for that crime anyway; and (3) the Government failed to sufficiently prove the underlying offense to establish conspiracy, including Jenkins' intent to sell firearms in New York. Each of these arguments is procedurally barred, without merit, or both. For the reasons that follow, I recommend that the petition be DENIED and the petition dismissed.

## BACKGROUND

### A.    Summary Of The Crime

Jenkins belonged to a group of individuals that trafficked guns from southern states to New York City.  Jenkins and his codefendant Trenton Pointer, who both resided in Virginia, supplied guns to codefendant Abdul Davis, who sold those firearms to an undercover officer in the New York City Police Department. Although Jenkins was in Virginia when he procured guns for Davis, intercepted phone calls showed that Jenkins knew that the guns were destined for resale in New York.

### B.    The Indictment

On or about April 20, 2016, a New York County grand jury returned a 119-count indictment against six defendants. (SR. 157-236.[1]) The defendants were Jenkins, Davis, Pointer, Shelita Funderberk (Davis's common-law wife), and suppliers Malik Rainey (from Georgia) and Milton Tillery (from Virginia).  Jenkins was named in five counts:

- Count 1, charging Conspiracy in the Fourth Degree (for conspiring to sell ten or more firearms),

- Count 65, third-degree criminal sale of a firearm (for an October 27, 2015 sale of a Lorcin nine-millimeter, semi-automatic pistol),

- Count 66, third-degree criminal sale of a firearm (for an October 27, 2015 sale of a Taurus .38 caliber revolver),

- Count 79, third-degree criminal sale of a firearm (for a December 7, 2015 sale of a Taurus nine-millimeter, semi-automatic pistol), and

- Count 118, third-degree criminal sale of a firearm (for an April 19, 2016 sale of a Hi-Point .40 caliber semi-automatic pistol).

(*Id.* 157, 207-08, 214, 234.)

---

[1] The Court uses the following citation conventions:  "SR." refers to the State Court Record.  (Dkts. 9-3 to 9-5.) Trial proceeding transcript pages are introduced by either a witness name or "T."  (Dkts. 9-6 to 9-11.) "S." refers to the sentencing transcript.  (Dkt. 9-11.)  "PX" refers to the Government's trial exhibits.

**C.    Codefendants' Guilty Pleas and the Mistrial**

Codefendants Rainey and Tillery pleaded guilty.  Jenkins and the remaining defendants proceeded to a joint jury trial, which began on November 13, 2017, before Justice Mark Dwyer.  The jury convicted codefendant Davis on all counts but acquitted Funderberk.  During deliberations, however, the court determined that a juror would be unable to continue to deliberate and declared a mistrial as to Jenkins and codefendant Pointer.  (*Id*. 41.)

**D.    The Retrial**

On September 17, 2018, the retrial of the charges against Jenkins and Pointer began before Justice Dwyer and another jury.  (*Id*. 42.)  Neither Jenkins nor his codefendant Pointer presented evidence or testimony.  (*Id*. 54.)

**1.  Investigation Of The Gun-Trafficking Operation**

In March 2015, Undercover Officer 180 ("UC-180") and Detective Christopher Shaughnessy, members of the NYPD's Firearms Investigation Unit ("FIU"), commenced an investigation into an arms dealer, Davis.  UC-180 acted as the primary undercover officer and purchased firearms from Davis.  Detective Shaughnessy served as lead detective and coordinated efforts to identify Davis's suppliers.  (UC-180: 53, 55, 57-61, 143; Shaughnessy: 201, 205-08, 211-12.)

During the investigation, UC-180 and Davis engaged in twenty-six transactions through which UC-180 purchased eighty firearms from Davis.  (UC-180: 62, 68-69, 114, 130; Shaughnessy: 209.)  In mid-October 2015, investigators received court permission to intercept phone calls, text messages, and GPS location data from Davis's phone. Periodic extensions were granted until Davis's arrest on April 22, 2016.  (Shaughnessy:

313-16, 338.)  A total of 15,770 calls and text messages were intercepted, of which 1,589 were deemed relevant to the investigation.  (Shaughnessy: 325, 339; *see* PX25 (telephone call recordings); PX28 (transcripts of recordings and texts).)   The GPS information showed that, around the time of the gun sales, Davis traveled back and forth from the New York metropolitan area to Georgia and Richmond, Virginia.  (Shaughnessy: 348-49; PX 29.)

Before the sales, UC-180 spoke and texted with Davis by cell phone.  (UC-180: 65, 80, 190.)  The sales took place in Manhattan, near the intersection of 166th Street and St. Nicholas Avenue.  Davis selected this location after UC-180 declined to meet him in New Jersey, which was where Davis resided.   (UC-180: 66-67, 73-74, 152, 158; Shaughnessy: 215, 234, 240.)  The sales were usually conducted in UC-180's car, and all but three were recorded on video.  (UC-180: 62, 67, 70, 177; Shaughnessy: 229.)  UC-180 paid Davis in cash or by depositing money into a bank account.  (UC-180: 66.)

At various times, Davis told UC-180 that he procured the guns that he sold to UC-180 in Georgia, South Carolina, and Virginia.  (UC-180: 67, 96, 132, 150, 158, 187.)  The investigation identified Jenkins as among Davis's firearms suppliers.  Other suppliers included codefendants Tillery, Rainey, Funderberk, and Pointer, as well as Ebony Clarke, Jeremy Lewis, and Jason Fulton.[2]  (Shaughnessy: 212.)  Bank records showed that Davis sent money to Jenkins and Pointer, among others.  (*See* PX64; Littell: 1333-34.)

---

[2] None of Davis's apparent suppliers lived in New York, and Detective Shaughnessy believed that Davis sourced the guns from the Atlanta area (where Rainey lived) and from the Richmond, Virginia area (where Tillery, Pointer, and Jenkins lived).  (Shaughnessy: 212, 221-25, 349, 1085-86.)  The police did not arrest apparent suppliers such as Clarke, Lewis, and Fulton whose communications with Davis never referenced New York. (Shaughnessy: 350, 612.)

### 2.    Jenkins Helps Davis Obtain Guns Sold In New York

#### a.  October 27, 2015 Sale

On October 26, 2015, Fulton told Davis that he expected to receive a handgun and possibly a shotgun.  Jenkins agreed to loan Davis $300 so that Davis could buy the guns from Fulton.  (Shaughnessy: 366; Nos. 8691, 8693 (calls between Davis and Jenkins); *see* Nos. 8632, 8639, 8653, 8660, 8682, 8686, 8689 (calls between Davis and Fulton).[3])

Fulton later texted Davis that his source had obtained a "b[r]and new Lawson 600" – which Shaughnessy understood to refer to a new Lorcin pistol – for $600.  (PX 28 at 75 (No. 8698); *see* Shaughnessy: 366-67.)  Davis retrieved that firearm from Fulton.  (No. 8704; *see* Shaughnessy: 367.)  Within the hour, Davis was on the phone with Jenkins, discussing a different gun and asking "[w]hat that other shit look[ed] like."  Jenkins responded that the "shit look[ed] brand new but … [was] scratched up," meaning that someone had "scratched the serial numbers off."  Jenkins told Davis that he would hold onto the defaced gun for Davis.[4]  (No. 8708; *see* Shaughnessy: 367-68.)

The next day, on October 27, 2015, Davis sold UC-180 two operable guns:  a defaced Taurus .38 caliber revolver and a loaded nine-millimeter Lorcin pistol.  (Shaughnessy: 360-65, 1103.)   Based on the prior intercepted communications, Detective Shaughnessy believed that Jenkins had helped Davis obtain these guns.  (Shaughnessy: 1103, 1107-09.)

---

[3] "No." refers to "Product Number," which is how the calls and text messages are identified.  (T. 334.)  The calls were played in court.  The jury received transcripts of the calls and text messages as demonstrative aids to aid them in interpreting the intercepted conversations.  (T. 344-45; PX28 (transcript of calls and texts).)

[4] Throughout their conversations, Jenkins and Davis refer to guns as "joints."  (*See* T. 104, 359-60, 402, 1004.)

### b. December 7, 2015 Sale

On November 24, 2015, Fulton texted Davis that a new nine-millimeter Ruger pistol was available for sale. (PX28 at 170-71 (Nos. 13661, 13662, 13663, 13664, 13665, 13669); *see* Shaughnessy: 410-11.) In a text message, Fulton told Davis, "If I do that someone gonna have to get it soon as [I] don't want to hold it for long." (PX28 at 172-73 (Nos. 13738, 13739); *see* Shaughnessy: 411.)

In a follow-up phone call, it was resolved that Davis would pay Fulton $475 for "shit," meaning the gun, and that Tillery would accept delivery on Davis's behalf. Davis added that he would send Fulton an extra $20 for Fulton to give to Tillery as payment for taking the gun. (No. 13755; *see* Shaughnessy: 411-12.) Later that afternoon, Davis asked petitioner to pick up the gun from Tillery and told him to keep $5 of the $20 Tillery had been given. (No. 13784; *see* Shaughnessy: 412.) Davis then told Tillery that Jenkins was "on his way" to Tillery's house to pick up the gun. (No. 13800; *see* T. 1628.) In a phone call the next day, Jenkins confirmed to Davis that Jenkins had picked up the gun. (No. 13918; *see* Shaughnessy: 413-14.)

On December 7, 2015, Davis sold UC-180 two operable firearms, including a silver Taurus pistol. Shaughnessy believed that the previously noted intercepted communications revealed the source of that firearm. Although of a lesser quality than a Ruger, the Taurus also was a nine-millimeter gun. (Shaughnessy: 408-13; *see* T. 1346, 1629.) The other weapon was a Smith and Wesson nine-millimeter semiautomatic pistol. (T. 1346.)

### c. April 19, 2016 sale

In a phone call on the morning of April 8, 2016, Jenkins asked Davis to send him

$1,300 for "something ... brand new."  Davis appeared to balk at the price, at which point Jenkins told him that "Yakul," another supplier, had criticized Jenkins for not asking Davis to pay even more money.  Jenkins reassured Davis that he had told Yakul that Davis was "[his] brother" and that he would not overcharge him (i.e., "dumb run that joint up behind his back").  Jenkins related that Yakul had responded that Jenkins knew that Davis was "gonna take it back to N- he gonna take it back up top" and sell the item for more money.  (No. 37737.)  Detective Shaughnessy understood "up top" to be a reference to New York.  (Shaughnessy: 1133-34; *see id*: 495.)

Three days later, on April 11, 2016, Jenkins told Davis that the seller was demanding a price of $450 for each of three firearms, which meant that Davis would have to pay $1350 total.[5]  Jenkins also stated that he had bought "one" for himself and wanted to buy one more; Jenkins added that he wanted Davis to "[t]ake yours and mines with you as soon as you can."  Continuing, Jenkins asked when he would see Davis, wondering whether it might be "Tuesday [or] Wednesday"; Davis responded that petitioner would see him by Friday" and that he "might leave Thursday."  (No. 38757; *see* Shaughnessy: 495.)

Two days later, on April 13, 2016, Davis agreed to give money to Jenkins. Jenkins said that he would "send two up there with you."  (No. 39021; *see* Shaughnessy: 496.)  Jenkins texted Davis his bank account information.  (PX28 at 602-03 (No. 38993); *see* Shaughnessy: 496.)  Six days later, on April 19, 2016, Davis sold UC-180 two guns, one of which was an operable Hi-Point .40 caliber pistol, which Shaughnessy believed

---

[5] Codefendant Davis called Jenkins by his nickname, Tariq.  Davis had a Facebook friend named "Tariq Shakur," whose profile photograph was received in evidence.  (Littell: 1337-39; *see* PX65.)  In summation, Jenkins conceded that he was the person in the photograph. (T. 1519; *see* T. 1553.)

had been a subject of the April 13 communications between Jenkins and Davis. (Shaughnessy: 484-85, 496-97, 1184; T. 1345.)

### 3.    Phone Tap Evidence Of Jenkins' Knowledge Of New York Sales

In various calls, Jenkins indicated that he understood that the guns that he provided to Davis would be sold up north, and specifically in New York.  (*See generally* T. 1589-92.) On October 16, 2015, before the first charged sale, in a phone call with Jenkins, Davis complained about Tillery, who he referred to as "Wes."  Davis complained that he had traveled "down here" to pick up a gun from Tillery; however, Tillery had to get rid of the gun before Davis arrived.  Davis complained that Tillery had not bothered to alert Davis even though Tillery knew that Davis was "coming down here."  Jenkins said that Tillery's poor judgment made him "leery" of Tillery.  Changing the subject, Jenkins told Davis that he had "another dude" who might be able to offer Davis a "little bit better" price and whose "shit" was "real real good."  (No. 6633; *see* Shaughnessy: 353-55.)

Speaking in code, Jenkins then told Davis that he was headed to Maryland to pick up his "grandmother."  Davis stated that he too was headed in that direction but would continue "going on up the road."  Jenkins stated that his grandmother wanted him "to take her to New York" to "get [some] furniture" and then bring her back to Maryland.  Jenkins said that he would try "to go to Manhattan," and Davis replied, "I'm not going to be in Manhattan tomorrow. I might be there Saturday."  Jenkins then said that he would be in Manhattan on Saturday, and Davis responded that he would "definitely" go to "New York" on "Saturday" "if this other shit work[ed] out."  (No. 6633; *see* T. 1589.)

 In another call, a week later, on October 23, 2015, Jenkins and Davis talked about how Jenkins had driven his grandmother "up there."  Davis then asked whether Jenkins

was "tak[ing] care of business down there."  Davis mentioned that he no longer lived in Virginia but "up here now."  (No. 7978; *see* Shaughnessy: 356-57.)

Other phone calls between Davis and Jenkins also reflected that Jenkins knew that Davis was not based in Virginia, but instead travelled there and to other states to meet firearms suppliers.  For example, in a phone call on November 23, 2015, Davis asked whether Jenkins had contacted his nephew; Jenkins responded that he would check with the nephew, who would be "down here" for "Thanksgiving," and Davis responded, "I could run down there or whatever."  (No. 13510; *see* Shaughnessy: 405.)  In another phone call, on the morning of January 10, 2016, Jenkins told Davis that his cousin, "Manny," from Atlanta, was another potential gun supplier and suggested that Davis "go down there" to meet Manny.  (No. 21857; *see* Shaughnessy: 428.)

In still other calls, Davis and Jenkins discussed their intent to sell guns in New York.  On January 11, 2016, Davis called Jenkins from "home," and stated that he would "go to New York" after he ate and slept.  Davis added that he needed to "set something up real, real quick" because he needed money.  Davis implored Jenkins, "See what you can do Tariq."  (No. 22251; *see* Shaughnessy: 429; T. 1590.)  That night, at 8:10 p.m., Davis met UC-180 at the usual location in Manhattan and sold him three guns.  (UC-180: 111-12.)  And, as described above, Davis and Jenkins had multiple calls in April 2016, in which they discussed the sale of three firearms for $450 each and referenced New York. From the various calls, Detective Shaughnessy determined that Jenkins was aware that Davis was selling guns in New York.  (Shaughnessy: 1133-34.)

## E.    The Verdict, Motion To Set Aside, And Sentence

On November 1, 2018, the jury found Jenkins (and Pointer) guilty of all counts.

(T. 1764-68.)  Before the court imposed a sentence, Jenkins filed a *pro se* motion to set aside the verdict, pursuant to N.Y. C.P.L. § 330.30.  (SR. 265-79.)  Jenkins argued, *inter alia*, that the jury received insufficient proof that he committed fourth-degree conspiracy, particularly based on a lack of proof that Jenkins intended to sell the requisite number of firearms.  (*Id*. 269.)  The court rejected the claim, finding the proof on all counts legally sufficient.  (S. 13-14.)

The court sentenced Jenkins, as a second violent felony offender, to an aggregate twelve-year prison term, consisting of (1) concurrent seven-year prison terms on two of the firearm sale counts (Counts 65 and 66), (2) concurrent five-year prison terms on the other two firearm sale counts (Counts 79 and 118), to run consecutively to the seven-year terms, and (3) an indeterminate prison sentence of from one-and-one-half to three years on the conspiracy count, to run concurrently to the other terms.  (*Id*. 17, 29-30.)

## F.    The Direct Appeal

On appeal, Jenkins argued that because he was in Virginia during the conspiracy, New York could not exercise jurisdiction over him, and that there was insufficient proof that he intended to sell firearms in New York or that he conspired to sell more than ten firearms.  He further argued that his conviction was against the weight of the evidence.[6] (SR. 1-30.)

The New York State Supreme Court, Appellate Division, First Department, unanimously rejected Jenkins' claims and affirmed the judgment of conviction.  (*Id*. 89-

---

[6] Jenkins also raised claims based on ineffective assistance of counsel, but the Appellate Division found the claims unreviewable because they involve matters not reflected or fully explained in the record, and Jenkins did not make a collateral challenge pursuant to N.Y. CPL 440.10.  (SR. 90-91.)  Jenkins has not asserted ineffective assistance of counsel as a basis for the instant petition.

91.)  The court held that the verdict was based on legally sufficient evidence and was not against the weight of the evidence.  The court ruled that the trial evidence "established the geographic jurisdiction of New York State over each offense based on Jenkins' acts and the acts of his accomplices."  (*Id*. 89 (citing N.Y. Penal Law § 20.00).)   The court reached this conclusion "notwithstanding that Jenkins was physically located in Virginia." (*Id.* (citing CPL §§ 20.20(1)(a),(2)(d); *People v. Kassebaum*, 95 N.Y.2d 611, 620, 744 N.E.2d 694, 699 (2001)).)

Commenting on the evidence at trial, the court concluded that the "testimony, documentary evidence, and intercepted communications showed that Jenkins and several accomplices engaged in a firearm trafficking operation, in which one participant arranged to purchase and pick up firearms in several southern states and transported them to New York for resale."  (*Id*. 89-90.)  The court noted that "[r]ecorded conversations between [Jenkins] and the accomplice [Davis], viewed as a whole, supported reasonable inferences that [Jenkins] knowingly supplied the accomplice with four firearms, and that [Jenkins] was aware that the accomplice [Davis] subsequently sold them in New York." (*Id*. at 90.)

Jenkins sought leave to appeal based on those same claims.  (*Id*. 92-101.)  On June 20, 2023, the New York State Court of Appeals denied leave.  (*Id*. 104.)

## G.    The Instant Petition

On September 10, 2023, proceeding *pro* se, Jenkins filed the instant petition, raising the same arguments he raised on direct appeal:  lack of jurisdiction and insufficient evidence. (Dkt. 1 at Grounds I and III.)  Jenkins also asserts that the court wrongfully sentenced him on the fourth-degree conspiracy charge and that the court acknowledged that Jenkins was

not guilty of that charge.  (Dkt. 1 at Ground II.)  The Government filed its response on January 24, 2024.  (Dkt. 9.)  On April 30, 2024, Jenkins filed both a "reply" and a "memorandum in support" of his petition.[7]  (Dkts. 17-18.)  The case has been referred to me for report and recommendation.  (Dkt. 5.)

## STANDARD OF REVIEW

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") limits a federal court's ability to provide habeas corpus relief.  28 U.S.C. § 2254(a).  Under AEDPA, a state prisoner's application for a writ of habeas corpus shall not be granted unless the state court's decision:

> (1) was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

---

[7] In his reply papers, Jenkins invokes additional constitutional grounds for his claims, specifically deprivation of due process under the Fourteenth Amendment.  (*E.g.*, Dkt. 18 at 4-5.)  However, he does not raise any different arguments – jurisdiction and legal sufficiency – than those raised in his petition.  He also suggests that the wiretap evidence obtained by the Government was somehow improper because it intercepted communications from outside New York.  (Dkt. 17 ¶ 9.)  In doing so, Jenkins references N.Y. C.P.L. § 20.60.  That provision, however, is inapt; among other things, it provides that "[a]n oral or written statement made by a person in one jurisdiction to a person in another jurisdiction by means of telecommunication, mail or any other method of communication is deemed to be made in each such jurisdiction."  *Id.*  Jenkins also suggests that a federal wiretap warrant was required to intercept interstate calls.  (Dkt. 17 ¶ 9.)  That is not correct.  *See People v. Schneider*, 176 A.D.3d 979, 980, 112 N.Y.S.3d 248, 249 (2d Dep't 2012) ("We reject the defendant's contention that the Supreme Court, Kings County, lacked jurisdiction to issue eavesdropping warrants against him to intercept cellular telephone calls and electronic messages which were made and received outside of New York State"), *aff'd*, 37 N.Y.3d 187, 151 N.Y.S.3d 1 (2021), *cert. denied*, 142 S. Ct. 344 (2021).  In any event, the petition does not assert the legality of the wiretap as a ground for relief, and it does not appear that Jenkins raised any such argument in state court.

28 U.S.C. § 2254(d).  In making that determination, a federal court must afford deference to the state court:

> Deciding whether a state court's decision 'involved' an unreasonable application of federal law or 'was based on' an unreasonable determination of fact requires the federal habeas court to 'train its attention on the particular reasons – both legal and factual – why state courts rejected a state prisoner's federal claims' … and to give appropriate deference to that decision.

*Wilson v. Sellers*, 584 U.S. 122, 125, 138 S.Ct. 1188, 1192-91 (2018) (internal citations omitted) (quoting *Hittson v. Chatman*, 576 U.S. 1028, 1028, 135 S.Ct. 2126, 2126 (2015) (Ginsburg, J., concurring in denial of certiorari)).

A state court decision is "contrary to" clearly established precedent when the state court applies a rule that is "diametrically different, opposite in character, or mutually opposed" to the governing law set forth in Supreme Court cases.  *Williams v. Taylor*, 529 U.S. 362, 405, 120 S.Ct. 1495, 1519 (2000) (internal quotations marks omitted) (quoting *Contrary*, Webster's Third New International Dictionary 495 (1976)).  Alternatively, a "court may grant relief under the 'unreasonable application' clause if the state court correctly identifies the governing legal principle … but unreasonably applies it to the facts of the particular case."  *Bell v. Cone*, 535 U.S. 685, 694, 122 S.Ct. 1843, 1850 (2002) (citing *Williams*, 529 U.S. at 407-08).  This inquiry focuses not on whether the state court's application of clearly established federal law was merely incorrect or erroneous but on whether it was objectively unreasonable.  *Bell*, 535 U.S. at 694 (citing *Williams*, 529 U.S. at 409-10).  "Under § 2254(d), a habeas court must determine what arguments or theories supported, or … could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories

are inconsistent with the holding in a prior decision of [the Supreme] Court." *Harrington v. Richter*, 562 U.S. 86, 102, 131 S.Ct. 770, 786 (2011).

AEDPA forecloses "'using federal habeas corpus review as a vehicle to second-guess the reasonable decisions of state courts.'" *Parker v. Matthews*, 567 U.S. 37, 38, 132 S.Ct. 2148, 2149 (2012) (per curiam) (quoting *Renico v. Lett*, 559 U.S. 766, 779, 130 S.Ct. 1855, 1866 (2010)). Accordingly, "[a] state court's findings are not unreasonable under § 2254(d)(2) simply because a federal habeas court reviewing the claim in the first instance would have reached a different conclusion." *Pine v. Superintendent, Green Haven Correctional Facility*, 103 F. Supp.3d 263, 275 (N.D.N.Y. 2015) (citing *Wood v. Allen*, 558 U.S. 290, 301, 130 S.Ct. 841, 849 (2010)). "The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable – a substantially higher threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473, 127 S.Ct. 1933, 1939 (2007).

Even if a trial court error meets the standards required by AEDPA, habeas relief is not warranted unless the violation "'had substantial and injurious effect or influence in determining the jury's verdict.'" *Brecht v. Abrahamson*, 507 U.S. 619, 637-38, 113 S.Ct. 1710, 1721-22 (1993) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776, 66 S.Ct. 1239, 1253 (1946)); *see also Fry v. Pliler*, 551 U.S. 112, 121, 127 S.Ct. 2321, 2327-28 (2007) (confirming continued applicability of *Brecht* under AEDPA); *Bentley v. Scully*, 41 F.3d 818, 824 (2d Cir. 1994) ("Habeas relief is not appropriate when there is merely a 'reasonable possibility' that trial error contributed to the verdict") (quoting *Brecht*, 507 U.S. at 637)); *Butler v. Graham*, No. 07-CV-6586, 2008 WL 2388740, *6 (S.D.N.Y. June 12,

2008) (recognizing and applying the "substantial and injurious effect" standard and citing *Brecht* and *Fry*).

The petitioner "bears the burden of proving by a preponderance of the evidence that his constitutional rights have been violated." *Jones v. Vacco*, 126 F.3d 408, 415 (2d Cir. 1997). The petitioner also bears "the burden of rebutting the presumption of correctness" of state court fact determinations "by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

## DISCUSSION

### I.

### Jenkins' Jurisdictional Claim Is Procedurally Barred And Meritless

Jenkins argues that because he was outside of New York State during the gun trafficking conspiracy, he could not be prosecuted in New York for the conspiracy or gun sales in New York. That claim, however, is procedurally barred: when Jenkins raised the claim in state court, he presented it solely as a violation of state, not federal, law. In any event, the claim has no merit because the Appellate Division's decision rejecting it was a reasonable application of law.

**A.    The Jurisdictional Claim Is Procedurally Barred**

As Jenkins raised his jurisdictional claim solely in state-law terms when he presented it in state court, he did not exhaust his claim for federal relief, and, because Jenkins has no further recourse in state court, the claim is procedurally defaulted.

Habeas relief is unavailable unless a petitioner has "exhausted the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(1)(A); *Carvajal v. Artus*, 633 F.3d 95, 104 (2d Cir. 2011). As the Supreme Court has held, state courts must be given

the first "'opportunity to pass upon and correct' alleged violations of its prisoners' federal rights.'" *Baldwin v. Reese*, 541 U.S. 27, 29, 124 S.Ct. 1347, 1349 (2004) (quoting *Duncan v. Henry*, 513 U.S. 364, 365, 115 S.Ct. 887, 888 (1995) (per curiam)). The exhaustion requirement "is designed to give the state courts a full and fair opportunity to resolve federal constitutional claims before those claims are presented to the federal courts." *O'Sullivan v. Boerckel*, 526 U.S. 838, 845, 119 S.Ct. 1728, 1732 (1999).

The exhaustion requirement involves two related questions. *Galdamez v. Keane*, 394 F.3d 68, 73 (2d Cir. 2005). "First, a federal court must examine whether applicable state court remedies remain available to the petitioner." *Id.* A petitioner need not have invoked every possible avenue of state court review, but instead must "give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." *Id.* (quoting *O'Sullivan*, 526 U.S. at 845). A "complete round" of direct appeal requires presenting a petitioner's federal claim to the highest court of the state, which in this case is the New York Court of Appeals. *See id.* at 74. To exhaust a claim raised before the state trial court in a collateral post-conviction motion, as in a motion made pursuant to CPL § 440.10 and § 220.60, a petitioner must seek leave to appeal the denial of the motion. *See Klein v. Harris*, 667 F.2d 274, 282-83 (2d Cir. 1981); *accord Ramos v. Walker*, 88 F. Supp.2d 233, 235 (S.D.N.Y. 2000).

"Second, and often of central concern in habeas proceedings," a petitioner must have "fairly presented his ... claims to the state courts, such that the state court had a fair opportunity to act." *Galdamez*, 394 F.3d at 73 (internal citations omitted) (quoting *O'Sullivan*, 526 U.S. at 848). Substantively, the petitioner must have apprised the state

courts of "both the factual and the legal premises of the claim [the petitioner] asserts in federal court." *Jones*, 126 F.3d at 413 (quoting *Daye v. Attorney General of New York*, 696 F.2d 186, 191 (2d Cir. 1982) (en banc)). Although the petitioner need not "cite chapter and verse of the Constitution in order to satisfy this requirement, he must tender his claim in terms that are likely to alert the state courts to the claim's federal nature." *Jackson v. Conway*, 763 F.3d 115, 133 (2d Cir. 2014) (internal quotation marks omitted) (quoting *Carvajal*, 633 F.3d at 104). A petitioner may meet this requirement by alleging a pattern of facts that is well within the mainstream of constitutional litigation. *Strogov v. Attorney General of New York*, 191 F.3d 188, 191 (2d Cir. 1999) (quoting *Daye*, 696 F.2d at 194).

Here, Jenkins did not present his jurisdictional claim to the Appellate Division as a violation of the United States Constitution (or federal law), as he needed to do in order to exhaust it. Instead, he argued that the jury received insufficient proof of territorial jurisdiction under New York law. (*See* SR. 14-19.) He thus failed to exhaust his jurisdictional claim with respect to his federal rights. *See Carvajal*, 633 F.3d at 106-08.

However, Jenkins cannot go back to state court to exhaust his claim as it is based on the record, and he already has had one direct appeal. *See Grey v. Hoke*, 933 F.2d 117, 120 (2d Cir. 1991) ("Petitioner cannot again seek leave to appeal these claims in the [New York] Court of Appeals because he has already made the one request for leave to appeal to which he is entitled"). The claim, therefore, is procedurally defaulted and deemed exhausted. *See id.*, 933 F.2d at 120-21; *Ramirez v. Attorney General*, 280 F.3d 87, 94 (2d Cir. 2001) ("Even if a federal claim has not been presented to the highest state court or preserved in lower state courts under state law, it will be deemed exhausted if it is,

as a result, then procedurally barred under state law").

The procedural bar is not absolute.  For a procedurally defaulted claim to be heard on habeas review, a petitioner "must show cause for the default and prejudice or demonstrate that failure to consider the claim will result in a miscarriage of justice (*i.e.*, the petitioner is actually innocent)."  *Aparicio v. Artuz*, 269 F.3d 78, 90 (2d Cir. 2001) (citing *Coleman v. Thompson*, 501 U.S. 722, 748-50 (1991)).  In determining if "cause" exists for the procedural default, the court limits its inquiry to whether "some external impediment" inhibited the petitioner from asserting the claim.  "To establish cause, the prisoner must 'show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule.'"  *Shinn v. Ramirez*, 596 U.S. 366, 379, 142 S.Ct. 1718, 1733 (quoting *Murray v. Carrier*, 477 U.S. 478, 488, 106 S.Ct. 2639, 2645 (1986)).  A "fundamental miscarriage of justice" is "an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent."  *Murray*, 477 U.S. at 495-96.

Jenkins cannot satisfy either standard.  He cannot meet the cause-and-prejudice standard because he advances no cause for his default, not even in reply.  *See Long v. Donnelly*, 335 F. Supp.2d 450, 464 n.10 (S.D.N.Y. 2004) ("Where a petitioner is unable to show cause, … the court need not consider actual prejudice").  Nor does Jenkins contend that he is actually innocent (let alone claim the existence of any new exculpatory evidence); rather, he claims that the proof of his guilt was not legally sufficient.  A claim of legal insufficiency, however, is not equivalent to a claim of actual innocence, which demands a showing of "factual innocence."  *Johnson v. Bellnier*, 508 F. App'x 23, 25-26 (2d Cir. 2013) (quoting *Bousley v. United States*, 523 U.S. 614, 623, 118 S.Ct. 1604, 1611

(1998)).  Jenkins thus cannot overcome his procedural default.

**B.    The Jurisdictional Claim Has No Merit**

Even if Jenkins' jurisdictional claim were not procedurally barred, the claim lacks merit.  The Appellate Division reasonably determined that Jenkins was properly tried in New York for his role in the gun trafficking conspiracy.  New York has jurisdiction to prosecute a defendant for criminal conduct when "either the alleged conduct or some consequence of it ... occurred within the State."  *People v. McLaughlin*, 80 N.Y.2d 466, 471, 606 N.E.2d 1357, 1359 (1992).  When a defendant disputes the issue, the prosecution has the burden to establish New York's territorial jurisdiction over the charged criminal conduct beyond a reasonable doubt.  *Id*. at 472.

New York may exercise territorial jurisdiction to prosecute certain crimes "[e]ven though none of the conduct constituting such offense may have occurred within this state." N.Y. CPL § 20.20(2).  In the case of accomplice liability, "jurisdiction over all defendants may be predicated on the conduct of an accomplice within New York."  *People v. Kassebaum*, 95 N.Y.2d 611, 620, 744 N.E.2d 694, 699 (2001) (citing CPL § 20.20(1)(a)). Here, the jury determined, and the Appellate Division agreed, that New York had jurisdiction to prosecute Jenkins for all crimes.[8]

Turning first to the gun sales, Davis sold the guns in New York, and the jury received abundant proof that Jenkins was Davis's accomplice.  In addition, the wiretap evidence showed that Jenkins knew, not just that Davis would be reselling the guns, but that he would be doing so in New York.  On October 16, 2015, Davis and Jenkins discussed the gun trafficking operation, and Davis said that he was "going on up the road."

---

[8] The court's instruction to the jury on state jurisdiction was fully consistent with the applicable New York legal principles.  (*See* SR. 256-57.)

The two men then talked about Jenkins' plan to drive his "grandmother" to New York, after which Davis said that "[i]f this other shit work[ed] out," he would "definitely go[ ] to New York" on Saturday.  (No. 6633.)  The jury could reasonably infer that the "other shit" for which Davis would go to New York was related to the gun-trafficking operation that they had just discussed.  In a subsequent conversation on January 11, 2016, Davis told Jenkins that he soon would be headed to "New York" and implored Jenkins "to set something up real, real quick," which indicated that Davis's planned trip to New York was related to the gun trafficking operation.  (No. 22251.)  On April 8, 2016, Jenkins used the term "up top" only after stating that Yakul had said, "you know he gonna take it back to "N- ."  The jury could make a reasonable inference that Jenkins had been about to say New York but decided to use coded language instead and substituted "up top."    (No. 37737; *see* Shaughnessy: 1333-34.)

In reply, Jenkins disputes the interpretation of the communications in which he was involved.  (*E.g.*, Dkt. 17 ¶¶ 10-14, 18.)  For instance, he asserts that "up top" and "N-" referred to New Jersey, where Davis lived, not New York.  (*Id*. ¶¶ 11, 18.)  However, in the context of the other communications about New York, and given that the gun sales indisputably took place in New York, the jury could easily have found that "N-" and "up top" referred to New York.  Jenkins' disagreement with the evidence is no more than a challenge to the legal sufficiency of the evidence, which, as discussed below, has no merit.

As for conspiracy, a conspiracy prosecution in New York is proper so long as at least one overt act in furtherance of the conspiracy occurred in New York.  N.Y. CPL § 20.20(2)(d).    The evidence readily established that at least one co-conspirator

committed an overt act in furtherance of the conspiracy in New York.  After all, the sales for which Jenkins was convicted as an accessory were alleged overt acts, and Davis transacted those sales with the undercover officer in New York.

In sum, Jenkins' jurisdictional claim is procedurally barred; and, even if it were not, it has no merit.

## II.

### Jenkins' Wrongful Sentence Claim
### Is Ineligible For Habeas Relief And Meritless

Jenkins contends that the trial court erred in sentencing him on the fourth-degree conspiracy charge.  That claim, however, is not eligible for habeas relief because Jenkins is no longer in custody on the fourth-degree conspiracy charge.  In any event, the claim is both unexhausted and meritless.

### A.    Petitioner Is Not in Custody on the Conspiracy Charge

"A district court has subject matter jurisdiction to consider a state prisoner's petition for habeas relief 'only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States' at the time he files the petition."  *Hurdle v. Sheehan*, No. 13-CV-6837, 2016 WL 4773130, at *2 (S.D.N.Y. Sept. 12, 2016) (quoting 28 U.S.C. § 2254(a)) (citing *Ogunwomoju v. United States*, 512 F.3d 69, 73-75 (2d Cir. 2008)) (emphasis and citation omitted).  "A habeas petitioner is no longer 'in custody under a conviction after the sentence imposed for it has fully expired.'"  *Id.* (quoting *Maleng v. Cook*, 490 U.S. 488, 492, 109 S.Ct. 1923, 1926 (1989)) (internal quotation marks omitted).  "Where, however, a prisoner serving a series of concurrent sentences challenges a shorter sentence that has already expired, the prisoner is no longer in custody on the shorter sentence, even if he remains in custody under a longer sentence,

since 'a successful habeas action resulting in a vacated concurrent sentence would have no effect on [the state prisoner's] release date from his other conviction and sentence.'" *Id.* at *3 (quoting *Sweet v. McNeil*, 345 F. App'x 480, 482 (11th Cir. 2009)) (collecting cases) (internal quotation marks and emphasis omitted).

Here, the court sentenced Jenkins to twelve years for multiple charges on November 29, 2018. The sentence for conspiracy was a one-and-one-half to three-years, running concurrently with the other terms of imprisonment. (S. 29.) Jenkins filed the instant petition on September 18, 2023, well after his sentence of fourth-degree conspiracy expired. Thus, even though Jenkins remains in prison, he has served out his term for conspiracy and thus is no longer in custody on that charge. Even if his conspiracy conviction were vacated, his release date would be unaffected. Accordingly, his challenge to the fourth-degree conspiracy charge is ineligible for habeas review. *See Hurdle*, 2016 WL 4773130, at *3-4 (denying habeas claim with respect to charge for which concurrent term of imprisonment had expired, and citing other cases to the same effect).

**B.    The Claim Is Unexhausted and Plainly Meritless**

Even if Jenkins' challenge to the conspiracy charge were not ineligible for review, the claim is both unexhausted and plainly meritless. The claim is unexhausted because Jenkins did not raise it in his state court appeal or request for leave to appeal to the Court of Appeals. The Court therefore cannot grant habeas relief. 28 U.S.C. § 2254(b)(1)(A); *Boerckel*, 526 U.S. at 844-45. And, because the claim has no merit, the Court may deny the claim on that basis as well. *See* 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State"); *Santana v. Bell*, No. 9:20-CV-1098, 2023 WL 6737931, at *24 (N.D.N.Y. Aug. 14, 2023) ("This is particularly true

where the claim is plainly meritless") (citing *Rhines v. Weber*, 544 U.S. 269, 277, 125 S.Ct. 1528, 1534-35 (2005)).

Although not entirely clear from his submissions, it appears that Jenkins' claim is based on the sentencing court's statement, "You're right about that," immediately after Jenkins asserted that the proof of his guilt on the conspiracy charge had been insufficient. (S. 12.) However, read in context, that reading is entirely incorrect. The sentencing court did not endorse Jenkins' legal insufficiency claim. Rather, the court noted that Jenkins had been "right" when Jenkins said that he had been convicted of fourth-degree conspiracy; the court had been briefly uncertain as to whether only codefendant Pointer had been convicted of that charge. Thereafter, the court rejected the legal insufficiency claim and imposed sentence on the conspiracy charge, noting that Jenkins had participated in a gun-trafficking conspiracy that brought "over 90 guns … to New York." (*Id*. 14, 16-17, 29-30.)

Jenkins should not be granted relief on his claim challenging his conviction and sentence for the fourth-degree conspiracy charge. The claim must be dismissed because Jenkins is no longer in custody on that charge. And, even if he were, the claim is unexhausted and plainly without merit.

### III.

### The State's Legal Sufficiency
### Ruling Was Not Unreasonable

Jenkins contends that there was insufficient proof that he intended to sell ten or more firearms in New York, a predicate for the conspiracy conviction, and that he acted as an accomplice to codefendant Davis in the individual gun sales. The Appellate Division rejected Jenkins' legal sufficiency arguments as meritless. (SR. 89-90.) The

Appellate Division's determination was not unreasonable. Accordingly, Jenkins is not entitled to habeas relief on his claim of legal insufficiency.

In seeking habeas corpus review, a petitioner who claims that the evidence was insufficient to sustain a conviction "bears a very heavy burden." *Fama v. Commissioner of Correctional Services*, 235 F.3d 804, 811 (2d Cir. 2000). That is because "[w]hen a federal habeas petition challenges the sufficiency of the evidence to support a state-court conviction, AEDPA establishes a standard that is 'twice-deferential.'" *Santone v. Fischer*, 689 F.3d 138, 148 (2d Cir. 2012) (quoting *Parker*, 567 U.S. at 43). "[A] state-court decision rejecting a sufficiency challenge may not be overturned on federal habeas unless the decision was objectively unreasonable." *Parker*, 567 U.S. at 43 (internal quotations marks and citation omitted). Accordingly, a petitioner making such a claim is entitled to habeas relief only if it is found "that upon the record evidence adduced at trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 324, 99 S. Ct. 2781, 2791-92 (1979). When assessing sufficiency of the evidence, the reviewing court is required to "consider the evidence in the light most favorable to the prosecution and make all inferences in its favor." *Fama*, 235 F.3d at 811 (citing *Jackson*, 443 U.S. at 319).

Jenkins' sufficiency challenge does not come close to meeting that demanding standard. Jenkins first contends that the People failed to introduce legally sufficient proof of that he acted as an accomplice to codefendant Davis. (Dkt. 1 at 5-6.) Not so. The jury received ample proof that Jenkins was culpable as Davis's accomplice. Jenkins was liable for Davis's criminal conduct as an accomplice if he "intentionally aided" Davis to engage in that conduct and acted with the mental culpability required for the commission

of the offense.  *See* N.Y. Penal Law § 20.00.  The proof that Jenkins intentionally aided Davis in the particular gun sales was abundant.  Jenkins loaned Davis money so that Davis could obtain the Lorcin pistol that he, in turn, sold to the undercover officer on October 27, 2015.  (*See* Shaughnessy: 366; Nos. 8691, 8693 (calls between Davis and Jenkins); *see* Nos. 8632, 8639, 8653, 8660, 8682, 8686, 8689 (calls between Davis and Fulton).)  Jenkins supplied Davis with the defaced Taurus .38 caliber revolver that Davis sold to the undercover officer on the same date.  (*See* Shaughnessy: 367-68; No. 8708.)  Jenkins was instrumental in physically transmitting the Taurus pistol that Davis sold to the undercover officer on December 7, 2015.  (*See* Shaughnessy: 413-14; No. 13918.)  And, Jenkins also supplied Davis with the Hi-Point .40 caliber pistol that Davis sold to the undercover officer on April 19, 2016.  (*See* Shaughnessy: 484-85, 496-97, 1184; No. 39021; T. 1345.)

There was also ample proof that Jenkins shared Davis's mental culpability. The mental state required for a sale crime is "knowingly."  *See People v. Kaplan*, 76 N.Y.2d 140, 144-45, n.3, 556 N.E.2d 415, 417, n. 3 (1990).  Jenkins' communications with Davis showed that he knew that Davis acquired the guns for purposes of resale.  (*E.g.,* Nos. 6633, 8708, 22251, 37737.)  In short, the evidence showed that Jenkins engaged in conduct and acted with the mental culpability that together rendered him criminally liable as an accessory to the charged sales.

Next, Jenkins contends that the jury received insufficient proof of his guilt for fourth-degree conspiracy.  (Dkt. 1 at 6.)  As discussed above, the Court lacks subject matter jurisdiction over this claim because Jenkins was not in custody on that charge when he filed the petition.  Regardless, the claim lacks merit.  A person commits Conspiracy in

the Fourth Degree when, "with intent that conduct constituting ... a Class B or Class C felony be performed, he or she agrees with one or more other persons to engage in or cause the performance of such conduct." N.Y. Penal Law § 105.10(1). Further, a conviction of any conspiracy charge requires proof that at least one of the conspirators committed an overt act in furtherance of the conspiracy. *See id*. § 105.20.

Here, the object crime of the conspiracy, as charged in the indictment, was Criminal Sale of a Weapon in the First Degree, a Class B felony based on the theory that Jenkins and his co-conspirators intended to unlawfully sell ten or more firearms in violation of N.Y. Penal Law § 265.13(1). [9]  The evidence showed that Jenkins agreed with Davis and others to unlawfully sell ten or more guns in New York. Phone calls between Jenkins and Davis demonstrated that Jenkins knew that Davis was selling guns in New York. The evidence did not need to show that Jenkins personally participated in ten sales; it was enough that the evidence gave rise to the inference that he purposefully joined an enterprise designed to transact at least that many sales in New York. That inference was amply supported by six months of conversations showing that Jenkins knew that Davis was heading a multistate operation, the goal of which was to sell as many guns as possible in New York for a profit.

---

[9] Jenkins argues that the conspiracy count was facially invalid because Conspiracy in the Fourth Degree requires commission of a Class B or C Felony under N.Y. Penal Law § 105.10, yet Jenkins was charged with and found guilty on four counts of Criminal Sale of a Firearm in the Third Degree, which is a class D felony under Penal Law § 265.11. (Dkt. 1 at 5.) That argument unduly conflates the charges against him. He was charged with, and found guilty of, four individual counts of Criminal Sale of a Firearm in the Third Degree, and separately one count of conspiracy, pursuant to N.Y. Penal Law § 105.10, to sell ten or more guns under Penal Law § 265.13(1), which constitutes Criminal Sale of a Firearm in the First Degree, a Class B Felony as required. The prosecution presented sufficient proof that Jenkins both conspired to sell ten or more guns, and participated as an accomplice in the sale of four guns.

26

Jenkins and Davis discussed other suppliers, and Davis discussed Jenkins with other suppliers.  For instance, Jenkins spoke with Davis about codefendant Tillery, and Davis and Tillery discussed Jenkins.  And, notwithstanding the use of some unfamiliar slang, the relevant conversations, decoded by Detective Shaughnessy, evinced conduct related to the gun-trafficking operation.  In other conversations, Jenkins suggested to Davis that Davis meet with potential gun suppliers.  Taken together, the intercepted communications showed that Jenkins was an active participant in an ongoing gun trafficking operation.

In rejecting Jenkins' challenge to the sufficiency of the evidence, the Appellate Division found that the "testimony, documentary evidence, and intercepted communications showed that [Jenkins] and several accomplices engaged in a firearm trafficking operation" to pick up guns from southern states and sell them in New York, and that the recorded conversations "viewed as a whole, supported reasonable inferences that [Jenkins] knowingly supplied the accomplice with four firearms" for sale in New York.  (SR. 89-90.)  Based on the evidence of record, the Court cannot conclude that the decision was "objectively unreasonable," *Matthews*, 567 U.S. at 43, or that "no rational trier of fact could have found proof of guilt beyond a reasonable doubt."  *Jackson*, 443 U.S. at 324.

## CONCLUSION

For the reasons stated above, I recommend that Jenkins' petition for habeas corpus be DENIED and the case dismissed.  To the extent not discussed herein, the Court has considered all of Jenkins' arguments and determined them to be without merit.

## PROCEDURES FOR FILING OBJECTIONS

Pursuant to 28 U.S.C. § 636(b)(1) and Rules 72, 6(a), and 6(d) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days to file written objections

to this Report and Recommendation. Any party shall have fourteen (14) days to file a written response to the other party's objections. Any such objections and responses shall be filed with the Clerk of the Court, with courtesy copies delivered to the Chambers of the Honorable Paul A. Engelmayer, United States Courthouse, 40 Foley Square, New York, New York 10007, and to the Chambers of the undersigned, at United States Courthouse, 500 Pearl Street, New York, New York 10007. Any request for an extension of time for filing objections must be addressed to Judge Engelmayer. **Failure to file timely objections will result in a waiver of the right to object and will preclude appellate review.**

Respectfully submitted,

_____

ROBERT W. LEHRBURGER
UNITED STATES MAGISTRATE JUDGE

Dated: November 21, 2024
       New York, New York

Copies transmitted on this date to all counsel of record. The Clerk's Office is directed to mail a copy of this report and recommendation to Petitioner and note service on the docket.